FILED

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

2026 OCT 29 P 12: 53

| | |
|---|---|
| KRISTYN REAM<br>8425 Hayden Lane<br>Annandale, Virginia 22003<br><br>Plaintiff,<br><br>v.<br><br>L3HARRIS TECHNOLOGIES, INC.<br>1025 West NASA Boulevard<br>Melbourne, Florida 32919<br><br>Serve: Corporation Service Company,<br>Registered Agent<br>100 Shockoe Slip, Fl 2<br>Richmond, Virginia 23219<br><br>Defendant. | Civil Action No. 1:26cv 3607-RDA-WBP |

**COMPLAINT AND JURY DEMAND**
**(ADA, Title VII, Virginia Human Rights Act, and Virginia Wage Payment Act)**

**INTRODUCTION**

1. Plaintiff Kristyn Ream brings this action against Defendant L3Harris Technologies, Inc. ("L3Harris") for disability discrimination, failure to accommodate, and retaliation in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq.; sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; sex discrimination, disability discrimination, failure to accommodate, and retaliation in violation of the Virginia Human Rights Act ("VHRA"), Va. Code § 2.2-3900 et seq.; and nonpayment of earned wages in violation of the Virginia Wage Payment Act, Va. Code § 40.1-29.

2. On February 17, 2026, Ms. Ream asked L3Harris Human Resources how to start the company's formal accommodation process. L3Harris terminated her on Monday, February 23, 2026, six days later and before she could submit the medical documentation Human Resources had told her to provide.

3. After the termination, L3Harris paid Ms. Ream no 2025 Management Incentive Plan ("MIP") award and demanded that she repay her $15,000 sign-on payment.

## JURISDICTION

4. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 12117(a), and 42 U.S.C. § 2000e-5(f).

5. This Court has supplemental jurisdiction over Ms. Ream's Virginia-law claims under 28 U.S.C. § 1367(a) because they form part of the same case or controversy as her federal claims.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. Ms. Ream timely filed EEOC Charge No. 570-2026-02704 against L3Harris, alleging sex discrimination, disability discrimination, failure to accommodate, retaliation, and discrimination associated with her caregiving responsibilities for a child with a disability.

7. On August 5, 2026, the EEOC issued a Determination and Notice of Rights authorizing Ms. Ream to sue L3Harris, and she received it that day.

8. Ms. Ream files this Complaint within ninety days of receiving the Notice and has satisfied all conditions precedent to bringing this action.

## VENUE

9. Venue is proper in this District and Division under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), as incorporated by 42 U.S.C. § 12117(a), because Ms. Ream worked at L3Harris's Herndon, Virginia facility and the unlawful employment practices occurred in this District. Fairfax County lies within the Alexandria Division. Local Civil Rule 3(B)(1).

## PARTIES

10. Plaintiff Kristyn Ream is an adult resident of Fairfax County, Virginia, and a citizen of the United States.

11. Defendant L3Harris Technologies, Inc. is a corporation headquartered in Melbourne, Florida, that does business in this District, including at 2235 Monroe Street,

Herndon, Virginia. L3Harris employs more than 500 employees and is an employer covered by the ADA, Title VII, the VHRA, and the Virginia Wage Payment Act.

## FACTS

### A. Employment and Performance

12. L3Harris hired Ms. Ream effective March 17, 2025, as Director of Strategy for the Tactical Missions and Cyber Division (internal classification: Senior Principal, Program Management). She reported to Matt Collins, Vice President and General Manager, and her duties included strategic planning, market analysis, business-growth initiatives, and advising senior leadership.

13. L3Harris paid Ms. Ream an annual salary of $260,000, designated a MIP target of 20 percent, and paid her a $15,000 sign-on payment subject to a twelve-month repayment provision.

14. Ms. Ream was qualified for her position and could perform its essential functions. Much of her strategy work and collaboration was performed virtually, including with people located outside Herndon.

15. In December 2025, Mr. Collins gave Ms. Ream forward-looking feedback that contemplated her return to Division Strategy Lead scope in 2026, participation in a first-quarter strategic reset, and expanded leadership responsibilities. He identified no misconduct, integrity concern, or performance deficiency warranting discipline.

16. Ms. Ream timely submitted her 2025 Workday self-assessment, which documented eight goals at “Met Expectations,” two at “Exceeded Expectations,” one “Unable to Rate,” and none below expectations. Mr. Collins did not complete or deliver manager ratings or hold the scheduled review meeting before L3Harris terminated her.

17. Before the termination, L3Harris never placed Ms. Ream on a performance-improvement plan, issued her a written warning, or disciplined her concerning her work performance, attendance, or schedule.

**B. Disabilities and Notice to L3Harris**

18. Ms. Ream has anxiety and depression, mental impairments that, when active, substantially limit one or more major life activities, including concentrating, sleeping, thinking, and staying organized at work.

19. Ms. Ream's conditions required ongoing medical care. She has taken anxiety medication since August 2023 and has attended therapy on a regular basis. Recurring medical appointments and the strain of a daily commute materially affected her symptoms and created a recurring need for schedule and location flexibility.

20. In June 2025, Ms. Ream contacted Human Resources employee Reagan Kittle because recurring medical appointments made it difficult to make up all missed hours, and asked whether she should file a disability-related claim or take another formal step. Ms. Kittle directed her to use sick leave and did not initiate a formal accommodation process.

21. Ms. Ream also informed Mr. Collins in writing of her recurring medical appointments and need for schedule flexibility. L3Harris therefore knew of her impairments and disability-related schedule needs months before February 2026.

22. Ms. Ream's young son has social-emotional developmental delays and attended a disability-related Fairfax County special-education preschool program. L3Harris, including Mr. Collins, knew of her relationship with her son and the recurring school and caregiving logistics associated with his disability.

**C. Prior Requests and Unequal Flexibility**

23. In or around July and August 2025, Ms. Ream requested schedule and location flexibility connected to her recurring medical needs and her son's disability-related educational program.

24. On August 29, 2025, during a retention discussion after she received an external job offer, Ms. Ream submitted a written, data-supported request for remote or hybrid status, explaining that eliminating a lengthy commute would reduce stress and improve productivity and that much of her team was located in Florida.

25. L3Harris denied the request verbally, telling Ms. Ream, among other things, that she had not worked for the Company long enough to request remote or hybrid status. It provided no written essential-functions or undue-hardship analysis and engaged in no documented interactive process.

26. When Ms. Ream raised recurring 8:00 and 8:30 a.m. meeting conflicts because her children's school did not begin until 9:05 a.m., Mr. Collins explained that his wife handled the children and school drop-off so that he could be available to work.

27. Male employees Ed Kelley, a Director of Strategy, and Tyler Wisecup, a Senior Manager of Business Development, worked within the same segment and under the same senior leadership and were permitted flexible, hybrid, or remote schedules without comparable adverse treatment. On information and belief, other Business Development employees were also allowed to work remotely from other states.

28. Although these employees had different immediate supervisors, they were subject to the same segment-level return-to-office expectations and corporate policies. L3Harris later admitted that it permitted remote, hybrid, and flexible arrangements depending on business needs, job responsibilities, or approved accommodations.

**D. Return-to-Office Directive and Accommodation Request**

29. On or about February 10, 2026, L3Harris issued a return-to-office directive making a 9/80 on-site schedule the baseline and ending informal flexibility arrangements. The directive required any ongoing or recurring deviation to be addressed through L3Harris's formal accommodation process, told employees who needed an accommodation to initiate that process, and stated that attendance noncompliance would be handled through progressive discipline, up to and including termination.

30. On February 17, 2026, Ms. Ream followed that instruction. She emailed Human Resources Business Partner China Robinson: "I read Sam's email and then Matt's email about working in the office. What is the accommodation process? I would like to initiate that."

31. Ms. Ream repeatedly asked L3Harris for a hybrid work schedule; a change from the 9/80 schedule to a regular eight-hour workday; and flexible arrival and departure times and work hours. She also asked whether she needed to file for a disability or other formal process, because she would be using substantial sick leave for her own medical appointments and to take her son to his Fairfax County special-education program.

32. On February 19, Ms. Robinson called Ms. Ream, told her to submit the request through L3Harris's website with medical documentation, and told her what documentation was required. Ms. Ream promptly contacted her healthcare provider to obtain it.

33. February 20 was Ms. Ream's scheduled 9/80 day off. L3Harris terminated her the next working day, Monday, February 23, before she had a meaningful opportunity to submit the medical documentation or complete the process Human Resources had just instructed her to begin.

34. L3Harris did not make an accommodation determination, analyze the essential functions of Ms. Ream's role, assess undue hardship, propose an alternative, or engage in a timely, good-faith interactive process before terminating her.

**E. The Termination**

35. On February 23, 2026, L3Harris terminated Ms. Ream by telephone. It did not suspend her, restrict her access, interview her, identify any document at issue, show her any investigative report, or ask for her explanation before deciding to terminate her.

36. On the call, L3Harris cited, for the first time, an alleged violation of its Code of Conduct and IT policy. Ms. Ream was shocked and confused. She was in the middle of her largest project of the year, and no one had raised any performance concern with her. She asked again what policy had been violated and what warnings or disciplinary options were available. L3Harris did not identify a specific policy provision, file content, data breach, or customer harm, and refused any lesser discipline. Mr. Collins said the conduct was "probably" a violation, referred to what he believed to be the "intent" of the policies, and said that he, Ms. Robinson, and Legal had held "a lot of conversations this week" that had been "building up to this point."

37. Ms. Robinson directly received Ms. Ream's February 17 request, spoke with her about it on February 19, and participated in the February 23 termination. On information and belief, the termination decision had not been finalized before L3Harris learned of the request, and one or more persons who selected, approved, or influenced the termination knew of it.

**F. MIP Denial and Financial Harm**

38. The 2025 MIP performance period ran from January 4, 2025 through January 2, 2026. L3Harris designated and treated Ms. Ream as a 2025 MIP participant with a 20 percent target. Her target award was $52,000 (20 percent of her $260,000 salary).

39. The MIP provides that participants who voluntarily or involuntarily terminate after the performance period remain eligible for payout, subject to plan metrics and personal performance. Ms. Ream remained employed through the entire performance period after her March 17 start date and was terminated about seven weeks after it closed.

40. Under the MIP, an incentive pool is calculated from the participant's target and base salary and adjusted by a financial Payout Factor derived solely from L3Harris's business results against Board-approved targets. That pool is then multiplied by an individual performance modifier, ranging from zero to 200 percent, which the MIP states reflects "each Participant's individual performance."

41. In its April 1, 2026 Definitive Proxy Statement filed with the SEC, L3Harris described fiscal year 2025 as "the strongest financial performance in our history" and reported that its named executive officers received fiscal-2025 incentive payouts of 133 to 200 percent of target. On information and belief, the 2025 Payout Factor exceeded target, and other MIP participants also received above-target payouts.

42. Mr. Collins never delivered a contrary manager review, communicated a negative individual modifier, or documented any performance, integrity, or conduct concern before the termination. In March 2026, L3Harris paid Ms. Ream no 2025 MIP award, reducing her individual performance modifier to zero. Mr. Collins, who selected and executed the termination, controlled or influenced that determination.

43. Ms. Ream, through counsel, demanded payment of her 2025 MIP award, and L3Harris refused. Its stated basis for refusing has shifted each time it was challenged. On or about April 7, 2026, its counsel asserted that Ms. Ream was ineligible because she "was not employed at the time any such payment would have been made." After Ms. Ream's counsel identified the plan language preserving eligibility for participants who separate after the performance period, L3Harris abandoned that position. On or about April 22, 2026, its counsel asserted instead that the plan gave the Company "sole discretion" and that it had "no obligation" to identify the factors underlying its determination. L3Harris has never identified any performance-based factor supporting a zero modifier.

44. L3Harris also demanded that Ms. Ream repay the $15,000 sign-on payment because it terminated her approximately three weeks before her first anniversary.

45. Between April 10, 2026 and July 31, 2026, Ms. Ream withdrew a total of $57,000 from a retirement rollover account ($15,000 on April 10, $20,000 on June 25, and $22,000 on July 31, 2026) to meet basic living expenses after L3Harris terminated her and denied her earned compensation. No hardship exception applied to the withdrawals, and none was granted. Each was subject to a ten percent early-withdrawal penalty in addition to ordinary income tax, and the withdrawn funds will no longer grow tax-deferred.

46. As a result of L3Harris's conduct, Ms. Ream has lost salary, incentive compensation, retirement contributions and benefits, and healthcare benefits; incurred the withdrawal penalties and taxes described above, job-search expenses, and approximately $8,000 in attorneys' fees in pre-suit efforts to resolve this dispute; experienced increased emotional distress; and suffered reputational and career harm and other losses, which continue to accrue subject to lawful mitigation offsets.

## CLAIMS

### COUNT I – Failure to Accommodate
### (ADA, 42 U.S.C. § 12112(b)(5)(A))

47. Ms. Ream is an individual with a disability within the meaning of the ADA and was qualified to perform the essential functions of her position with or without reasonable accommodation.

48. L3Harris knew of her impairments and related limitations through her 2025 communications with Human Resources and Mr. Collins and her February 17, 2026 request to initiate the formal accommodation process.

49. Remote or hybrid work, flexible start and end times, and flexibility for recurring medical appointments were reasonable accommodations that would have enabled Ms. Ream to perform the essential functions of her position. L3Harris had permitted substantial virtual performance of her duties and flexible or hybrid arrangements for other employees.

50. L3Harris failed to provide a reasonable accommodation and failed to engage in a timely, good-faith interactive process, terminating Ms. Ream before she could submit the documentation Human Resources had requested and before any individualized analysis.

51. As a result, Ms. Ream has suffered and continues to suffer loss of pay and benefits, reputational and career harm, emotional distress, and mental anguish.

### COUNT II – Disability Discrimination
### (ADA, 42 U.S.C. § 12112(a))

52. Ms. Ream was a qualified individual with a disability, performed her job successfully, and had no prior discipline or documented performance deficiency.

53. L3Harris knew of her disability-related schedule needs and subjected her to adverse actions, including denial of equal flexibility, termination, denial of MIP compensation, and a demand for repayment of the sign-on payment.

54. Given the repeated notice, the abrupt termination before the accommodation process was completed, decisionmaker knowledge, the unsupported and changing rationale, and

more favorable treatment of employees without her disability-related needs, Ms. Ream's disability was a but-for cause of one or more of these adverse actions.

55. As a result, Ms. Ream has suffered and continues to suffer loss of pay and benefits, reputational and career harm, emotional distress, and mental anguish.

**COUNT III – Retaliation**
**(ADA, 42 U.S.C. § 12203(a))**

56. Ms. Ream engaged in protected activity by requesting disability-related flexibility in 2025, asking Human Resources whether she should initiate a disability process, and formally initiating L3Harris's accommodation process on February 17, 2026.

57. Ms. Robinson had direct knowledge of the February 17 request and participated in the termination. Mr. Collins and other decisionmakers knew of Ms. Ream's earlier disability-related needs and, on information and belief, knew of the February 17 request before the termination decision was finalized.

58. L3Harris terminated Ms. Ream six days after she initiated the formal process, then denied her MIP compensation and demanded repayment of the sign-on payment.

59. The termination call itself identified conversations involving Ms. Robinson, Legal, and Mr. Collins during the week of the request. The close timing, decisionmaker knowledge, lack of a specific explanation, refusal to consider lesser discipline, and L3Harris's later shifting explanations for its actions show that Ms. Ream's protected activity was a but-for cause of one or more adverse actions.

60. As a result, Ms. Ream has suffered and continues to suffer loss of pay and benefits, reputational and career harm, emotional distress, and mental anguish.

**COUNT IV – Associational Disability Discrimination**
**(ADA, 42 U.S.C. § 12112(b)(4))**

61. Ms. Ream was qualified for her position, and L3Harris knew she has a close relationship with her son, an individual with a disability whose special-education program created recurring caregiving and schedule logistics.

62. Mr. Collins, who knew of those responsibilities, contrasted Ms. Ream's situation with his own ability to rely on his wife for childcare. Male employees whose spouses absorbed childcare, or who received flexible arrangements, were not subjected to comparable adverse action.

63. L3Harris denied Ms. Ream equal terms and privileges of employment and terminated her under circumstances supporting an inference that it regarded her disability-related caregiving responsibilities as inconsistent with the rigid availability it expected, in violation of 42 U.S.C. § 12112(b)(4).

64. As a result, Ms. Ream has suffered and continues to suffer loss of pay and benefits, reputational and career harm, emotional distress, and mental anguish.

**COUNT V – Sex Discrimination**
**(Title VII, 42 U.S.C. § 2000e-2(a))**

65. Ms. Ream is a woman and a working mother protected by Title VII. L3Harris subjected her to adverse employment actions, including denial of equal schedule and location flexibility, termination, and denial of MIP compensation.

66. Mr. Collins's explanation that his wife handled childcare so he could meet rigid work demands reflected a sex-based caregiver stereotype, applied to Ms. Ream by a manager who participated in the challenged decisions.

67. Male employees under the same corporate and segment policies received flexible, hybrid, or remote arrangements that L3Harris denied to Ms. Ream. Ms. Ream's sex was a motivating factor in one or more adverse actions.

68. As a result, Ms. Ream has suffered and continues to suffer loss of pay and benefits, reputational and career harm, emotional distress, and mental anguish.

**COUNT VI – Sex and Disability Discrimination**
**(VHRA, Va. Code § 2.2-3905)**

69. L3Harris discharged and otherwise discriminated against Ms. Ream with respect to compensation, terms, conditions, and privileges of employment because of her sex and disability, and used sex and disability as motivating factors in the challenged practices.

70. The facts supporting Counts II and V also establish violations of Va. Code § 2.2-3905(B)(1) and (6).

71. As a result, Ms. Ream has suffered and continues to suffer loss of pay and benefits, reputational and career harm, emotional distress, and mental anguish.

**COUNT VII – Failure to Accommodate and Accommodation Retaliation**
**(VHRA, Va. Code § 2.2-3905.1)**

72. Ms. Ream was an otherwise qualified person with a disability, L3Harris knew of her impairments, and she requested reasonable accommodations necessary to assist her in performing her job.

73. L3Harris refused to make a reasonable accommodation, failed to engage in a timely, good-faith interactive process, and took adverse action against Ms. Ream because she requested an accommodation. The facts supporting Counts I and III also establish violations of Va. Code § 2.2-3905.1(B)(1), (2), and (5).

74. As a result, Ms. Ream has suffered and continues to suffer loss of pay and benefits, reputational and career harm, emotional distress, and mental anguish.

**COUNT VIII – Failure to Pay Wages: 2025 MIP**
**(Virginia Wage Payment Act, Va. Code § 40.1-29)**

75. Ms. Ream's 2025 MIP award constitutes wages, a bonus, or other remuneration promised for service and performance within the meaning of Va. Code § 40.1-29.

76. Ms. Ream satisfied the MIP's service condition: she remained employed through the entire 2025 performance period and separated after its close, when the plan states that a terminated participant "remain[s] eligible for a payout subject to the incentive plan metrics and personal performance."

77. The only component of the award committed to management discretion is the individual performance modifier, which the MIP defines as reflecting "each Participant's individual performance." That reservation of discretion did not authorize L3Harris to set the modifier at zero for a reason unrelated to Ms. Ream's actual performance, including a discriminatory or retaliatory reason, or without a documented, good-faith performance basis.

78. L3Harris did not make a good-faith, plan-compliant determination. Ms. Ream's documented performance contained no below-expectations rating, no negative modifier was ever communicated, the manager who executed her termination controlled or influenced the modifier decision, and L3Harris has offered shifting, inconsistent justifications rather than a performance-based rationale.

79. Had L3Harris applied a good-faith modifier consistent with Ms. Ream's documented performance and the Company's 2025 financial results, she would have received a 2025 MIP payout. L3Harris's failure to pay any amount violates Va. Code § 40.1-29. Ms. Ream is entitled to the unpaid amount, statutory damages, and interest.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Kristyn Ream respectfully requests that the Court enter judgment in her favor and against Defendant L3Harris Technologies, Inc., on all claims and:

a. declare that L3Harris violated the Americans with Disabilities Act, Title VII, the Virginia Human Rights Act, and the Virginia Wage Payment Act;

b. award back pay from the date of termination through judgment, including lost salary, incentive compensation, bonuses, raises, retirement contributions, healthcare and other benefits, less lawful mitigation offsets;

c. order reinstatement to her former or a substantially equivalent position or, if reinstatement is infeasible, award front pay;

d. award make-whole relief for her retirement-related losses, including lost employer contributions and matching funds, early-withdrawal penalties and additional taxes

on the $57,000 withdrawn, and lost tax-deferred earnings, without duplicative recovery;

e. award compensatory damages for past and future pecuniary losses, emotional distress, mental anguish, reputational and career harm, and other injuries, in the maximum amount permitted by law;

f. award punitive damages for L3Harris's malice or reckless indifference to her protected rights, in the maximum amount permitted by law;

g. award the unpaid 2025 MIP compensation, an additional equal amount as liquidated damages or, alternatively, treble damages for a knowing failure to pay wages, and interest at eight percent per year under Va. Code § 40.1-29;

h. prevent L3Harris from recovering the $15,000 sign-on payment or, alternatively, award an offset sufficient to prevent Ms. Ream from bearing that obligation as a consequence of the unlawful termination;

i. award prejudgment interest where legally available and post-judgment interest under 28 U.S.C. § 1961;

j. award an appropriate tax-component or gross-up for adverse tax consequences, including those of a lump-sum judgment covering multiple tax years;

k. award reasonable attorneys' fees, litigation expenses, and costs to the extent incurred and authorized by law, including approximately $8,000 in attorneys' fees she paid before filing suit;

l. order injunctive and equitable relief, including correction of her personnel records, removal of any characterization of her separation as misconduct or a security violation, and neutral employment verification; and

m. award such other and further relief as the interests of justice may require.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Date: 10-29-26, 2026

Respectfully submitted,

Kristyn Ream

Kristyn Ream, Pro Se
8425 Hayden Lane
Annandale, Virginia 22003
Telephone: (630) 975-1228
Email: Kristyn.Ream@gmail.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

KRISTYN REAM
**Plaintiff(s),**

**v.**

**Civil Action Number:** ______________________________

L3HARRIS TECHNOLOGIES, INC.
**Defendant(s),**

## LOCAL RULE 83.1 (N) CERTIFICATION

**I declare under penalty of perjury that:**

**No attorney has prepared or assisted in the preparation of** Complaint and Jury Demand.
**(Title of Document)**

Kristyn Ream
Name of *Pro Se* Party (Print or Type)

Kristyn Ream
Signature of *Pro Se* Party

Executed on: 10-29-26 (Date)

**OR**

**The following attorney(s) prepared or assisted me in preparation of** ______________________________.
**(Title of Document)**

______________________________
(Name of Attorney)

______________________________
(Address of Attorney)

______________________________
(Telephone Number of Attorney)
Prepared, or assisted in the preparation of, this document.

______________________________
(Name of *Pro Se* Party (Print or Type)

______________________________
Signature of *Pro Se* Party

Executed on: ______________________(Date)

FILED

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

2026 OCT 29 P 12: 53

KRISTYN REAM
**Plaintiff(s),**

**v.**

**Civil Action Number:** 1:26 cv 3607

L3HARRIS TECHNOLOGIES, INC.
**Defendant(s),**

**LOCAL RULE 83.1 (N) CERTIFICATION**

**I declare under penalty of perjury that:**

**No attorney has prepared or assisted in the preparation of** Complaint and Jury Demand.
**(Title of Document)**

Kristyn Ream
Name of *Pro Se* Party (Print or Type)

Kristyn Ream
Signature of *Pro Se* Party

Executed on: 10-29-26 (Date)

**OR**

**The following attorney(s) prepared or assisted me in preparation of** ____________.
**(Title of Document)**

____________
(Name of Attorney)

____________
(Address of Attorney)

____________
(Telephone Number of Attorney)
Prepared, or assisted in the preparation of, this document.

____________
(Name of *Pro Se* Party (Print or Type)

____________
Signature of *Pro Se* Party

Executed on: ____________(Date)